# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **HAWAII-PACIFIC APPAREL GROUP, INC.**, 3037 Vail Avenue Los Angeles, California  90040, | Case No. 04 CV 7863 (DC) |
| | Judge: |
| | The Honorable Denny Chin |
| Plaintiff/Counterclaim Defendant/ Counterclaim Plaintiff, | |
| vs. | |
| **CLEVELAND BROWNS FOOTBALL COMPANY, LLC** 76 Lou Groza Boulevard Berea, Ohio  44017 | |
| and | |
| **NATIONAL FOOTBALL LEAGUE PROPERTIES, INC.** 280 Park Avenue New York, New York  10017, | |
| Defendants/Counterclaim Plaintiffs/ Counterclaim Defendants. | |

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PRIORITY OF USE IN INTERSTATE COMMERCE

**Christine Karol Roberts, CR 0669**
**Law Offices of Christine Karol Roberts**
**1109 West Twenty-First Street**
**Floral Park, California  92706**
**Telephone:  (714) 479-0024**

**Attorney for Plaintiff**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    A.    THE DAWG POUND AND THE BROWNS BEFORE 1994 . . . . . . . . . . . . . . . 2
    B.    THE DAWG POUND AND THE BROWNS FROM AND AFTER 1998 . . . . . 8

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**                                                                                                         **Page**

*Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd.*,
    34 F.3d 410 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427 (7th Cir. 1999) . . . . . . 4, 5

*University Book Store v. Board of Regents of the University of Wisconsin*,
    33 U.S.P.Q.2d 1385, 1994 WL 747886 (TTAB 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*University of Pittsburgh v. Champion Products Inc.*, 686 F.2d 1040 (3d Cir.),
    *cert. denied*, 459 U.S. 1087 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## ARGUMENT

COMES NOW the Plaintiff, and in opposition to Defendants' motion for partial summary judgment, states the following:

For purposes of clarity of the presentation of the arguments of both sides, HP offers the following sequence of events:

### TIME LINE OF SIGNIFICANT EVENTS

| | |
|---|---|
| 1985 | "Dawg pound" is coined by fans of the Cleveland Browns to describe their location in Memorial Stadium, former venue for home games of the Browns |
| November 1, 1985 | Browns file "Cleveland Browns Dawgs" applications for registration with State of Ohio |
| June 30, 1988 | State of Ohio rejects Browns' application to register DAWG |
| 1991 | DAWG POUND adopted as a trademark on behalf of HP |
| March 3, 1994 | HP applies to register mark DAWG POUND in International Class 25, alleging first use on March 1, 1994; opposed by NFLP/the Browns |
| May 6, 1994 | First shipment of goods by HP using DAWG POUND mark |
| March 28, 1995 | Federal registration of mark TOP DAWG in International Class 25 issues in favor of HP, alleging first use of mark on Feb. 1, 1991; unopposed |
| April 6, 1995 | First shipment of goods by HP using LIL DAWG POUND mark |
| November 6, 1995 | Browns announce departure to Baltimore |
| Nov. and Dec. 1995 | State of Ohio cancels Browns' registrations for nonrenewal |
| March 19, 1996 | Federal registration of mark LIL DAWG POUND in International Class 25 issues in favor of HP, alleging first use of mark on March 1, 1995; unopposed |
| January 22, 1997 | First shipment of goods by HP using DA DAWG mark |
| March 26, 1999 | Browns file ITU applications for "dawg pound" marks; applications denied registration by USPTO |

| | |
|---|---|
| August 28, 1999 | Browns file ITU applications for PUPPY POUND mark; applications denied registration by USPTO |
| Fall 1999 | Browns return to play football in Cleveland |

---

### A. THE DAWG POUND AND THE BROWNS BEFORE 1994

Their initial submissions have illuminated the respective positions of the parties. NFLP/the Browns argue (and HP agrees) that the term "dawg pound" had been used in a variety of ways to refer to the Cleveland Browns or their fans or their players. By a legally and factually unsupported process of osmosis, however, NFLP/the Browns argue that the term has assumed the status of a trademark, and that the trademark became the property of the Browns. Nowhere in the mass of exhibits submitted by NFLP/the Browns is there a single illustration of the use of the alleged "Dawg Pound" mark by either the NFLP or the Browns, except with an explicit association with the Cleveland Browns. Notably, NFLP/the Browns have not produced a single license for the mark DAWG POUND prior to 1998. In articles or promotional pieces about the NFL or the Browns, there is a casual reference to the "dawgs" or to the "dawg pound," which, in context, must be only a reference to the fans or players of the Browns football club. It bears repeating that HP has no quarrel with the use by NFLP/the Browns of the mark the CLEVELAND BROWNS. What is objectionable is their attempt to bootstrap their acknowledged right to use and protect that mark into a claim to the DAWG POUND mark, merely because it is used by them in association with the name, trade dress, and logos of the Cleveland Browns.[1]

To make the distinction crystal clear between HP's bona fide use of DAWG POUND as a trademark and NFLP/the Browns' use of the term in association with the Cleveland Browns is Exhibit A (Ex. A.) hereto, which is a composite photocopy of actual labels used in garments by HP.

---

[1] Significantly, NFLP sought protection only by copyright, not by trademark. (Ex. K.)

2

There are salient facts in this regard worth noting. First, the labels use only the marks with no secondary references to a football club, hockey club, or anything else. Second, the marks LIL DAWG POUND, TOP DAWG, and DAWG POUND are used precisely in the same way on each label. Significantly, NFLP/the Browns never objected to HP's application to register LIL DAWG POUND or TOP DAWG, despite the similarity to and association with DAWG POUND, which it now claims to have used since the middle 1980s.[2] In the entire mass of discovery materials submitted on behalf of NFLP/the Browns, in both the opposition proceedings and this cause of action, it has presented not a single example of a label, hang tag, or product insert that would demonstrate the use of DAWG POUND as a source or origin of the goods. Instead, the term is used by them only as an illustration (as on a t-shirt or sweat shirt) or as part of a text message (as in an article, a promotional document, or the like).

As but one example of the inept argument made by NFLP/the Browns, the Memorandum in Support at 7 quotes the *Los Angeles Times* of Oct. 21, 1985, for the proposition that the Browns' fans came to a Browns game wearing "Dawg Pound T-shirts," but nowhere is there any indication of the *source* of those t-shirts. For all we know, the t-shirts could have been hand-lettered or screened by the fans themselves. There is no question that the Browns fans identified with "the dawgs," meaning the Cleveland Browns players and the club, but that has no relevance or legal effect on whether the source of the garments in question was the Browns, NFLP, a licensee of either of them, or someone entirely unrelated. (*See* Composite Ex. B.) Mr. Lucarelli, a promotions employee of the Browns since 1975, presumably inadvertently, coalesces the NFLP/the Browns' argument. He asserts as follows:

---

[2]As noted previously, the USPTO rejected the Browns' ITU applications to register DAWG POUND and PUPPY POUND in large part because of HP's registration of TOP DAWG and LIL DAWG POUND.

3

>       6.      In the fall of 1985, the "Dawg Pound" was born. Because the fans in the "bleachers" at the open end of the Stadium were most partial to wearing this dog-related apparel, millions of viewers, listeners, readers, and, most recently, Internet subscribers everywhere naturally have referred to this section of the Stadium as the "Dawg Pound." Some also have referred to the whole of the Stadium as the "Dawg Pound" because it is the place where the "Dawgs" play.
>
>       7.      The Browns were immediately inseparable from their DAWGS and DAWG POUND designations. DAWGS and DAWG POUND merchandise was quite popular with the fans in the mid-1980s and 1990s and continues to be very popular today. I recall seeing Browns fans in the 80s and 90s at the Stadium with a wide variety of DAWGS and DAWG POUND merchandise, such as t-shirts, hats, and banners.

(Declaration of Dino Lucarelli ¶¶ 6, 7.)

Fair enough, but do any of those allegations, assuming (as we must) that they are true, establish that NFLP or the Browns were the *source* of any of that merchandise? Of course, they do not. (*See* Composite Ex. B.) In fact, at the time, the Browns never claimed any right to protect the mark DAWG POUND. In a "cease and desist" letter from 1988 (Ex. C.), no reference is made to DAWG POUND, even though the list of Browns trademarks is obviously intended to be comprehensive.

The argument of NFLP/the Browns, to the extent it has any plausibility, seems to be that by virtue of the public use of the term "dawgs" to refer to the Browns' fans or players and to the "dawg pound" as the fans' preferred seating venue in former Municipal Stadium, the use of the term "dawg pound" inures to NFLP/the Browns as a sort of imputed trademark. There is no support for that position. NFLP/the Browns predictably cite *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427 (7th Cir. 1999), and *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd.*, 34 F.3d 410 (7th Cir. 1994), but those cases do not control the outcome here. In *Blastoff*, the court held that because the NFL claimed rights to the mark LOS ANGELES RAMS, they could also protect the mark ST. LOUIS RAMS, when that franchise relocated to that latter city.

Correspondingly, when the Colts relocated to Indianapolis, the NFL could still claim protection for the Baltimore Colts mark because of the close association of the Colts mark with the club. In both cases, the identification of the football clubs as the Rams and Colts was so clear, explicit, and unmistakable that the carryover of that protection to the relocated St. Louis Rams and Indianapolis Colts clubs was clear. In other words, the protection that attended the trademarks RAMS and COLTS, which were created by long-time trademark use, preceded the publicity that surrounded the relocation of the clubs. Here, NFLP/the Browns are trying to assert that the publicity creates the mark in the first instance, a position which stands those two cases on their heads.

There are other cases similar to *Blastoff* and *Colts* that conclude quite properly that where the association of the term with the owner of the mark is so definitive as virtually to identify the mark owner, the owner can claim protection for the term as a trademark, as if it were a virtual trade name. The owner can thus prevail against another user whose unauthorized use of the mark creates a confusing inference of sponsorship or endorsement by the true owner, even if the unauthorized use is not, strictly speaking, a trademark use. Many of these cases involved the unauthorized and unlicensed use of an athletic team name, logo, or university name on, for example, sweat shirts or t-shirts. *See University of Pittsburgh v. Champion Products Inc.*, 686 F.2d 1040, 1042 n.5 (3d Cir.), *cert. denied*, 459 U.S. 1087 (1982) (the Pitt Panthers); *University Book Store v. Board of Regents of the University of Wisconsin*, 33 U.S.P.Q.2d 1385, 1994 WL 747886 (TTAB 1994) (the Wisconsin Badgers).

The distinction between those cases and this case is so obvious as to require little elaboration. In each of those cases, the unauthorized user was deliberately trading on the affiliation of the mark or logo with the university or professional athletic club. There can be but one Wisconsin Badgers, but one Pittsburgh Panthers, and but one St. Louis Rams. That is quite a different proposition than

5

arguing that merely because there was a great deal of publicity about the fans referring to their domain as the "dawg pound" that their use of that term by some process of osmosis became a Browns or an NFL trademark. In all of the foregoing cases, the unauthorized user of the mark in suit adopted and used it *because* of the affiliation with the league, the club, or the institution. Here, HP adopted and used DAWG POUND as a mark without any knowledge of NFLP/the Browns' claim and, indeed, *despite* their later, belated claim to the mark. NFLP/the Browns can point to not one single use of the mark DAWG POUND by HP that refers, suggests, or even hints at any affiliation with the NFL, the Browns, Cleveland, or Municipal Stadium. Yet without the explicit association of DAWG POUND with the Cleveland Browns, NFLP/the Browns can claim no right to DAWG POUND at all. Virtually every image and reference to DAWG POUND submitted by NFLP/the Browns makes explicit reference to the Browns, at least until about 1998. (Even then, NFLP was claiming no rights to "dawg pound," relying instead on expired state registrations. (*See* Ex. M.)) Without that reference, the term means nothing to them or to any potential consumer.

NFLP/the Browns completely misapply the affiliation/sponsorship cases. With nothing more, the public associates "Browns" with Cleveland, "Steelers" with Pittsburgh, and "Jets" with New York. Yet without an explicit association with the Cleveland Browns, NFLP's use of DAWG POUND is completely meaningless. HP's use of DAWG POUND on a label attached to a garment, on the other hand, can mean nothing other than that the owner of that trademark is the source of that good, no matter in what context "dawg pound" might otherwise be understood by the consumer. The unauthorized or subordinate user of WISCONSIN BADGERS chose to use that mark *because* of its association with the university's athletics and would seek to trade on that association. HP could care less about the public's knowledge of the "Cleveland Browns Dawgs," so long as the next time that consumer purchases a garment, he will look for the DAWG POUND mark on the label. The garment

6

sold in association with that mark may have a football reference, a boxing reference, or no particular reference at all. The illustration on the garment, in other words, means nothing to HP, while it means everything to NFLP/the Browns. That is the distinction between HP's trademark use and NFLP/the Browns' purely illustrative or decorative use of the term.

In HP's Memorandum in Support of Motion for Partial Summary Judgment, reference was made to two sales reports, Exs. M and N thereto, which mention "dawg pound" or "top dawg." These and other sales reports are reproduced and submitted as Exhibit 17 to the Declaration of Ann McDowell by the Defendants. The image associated with the license, however, Exhibit 16 to the Declaration of Ann McDowell, is the kind of now-familiar "Cleveland Browns Dawgs" on a sweat shirt that NFLP/the Browns have produced in abundance. The graphic image associated with the licensee's sales, however, does not use the mark DAWG POUND.[3] Instead, it is simply a sweat shirt design incorporating the term "dawgs" with the Cleveland Browns trademark. While the submissions of NFLP/the Browns are replete with conclusory statements about its use of the DAWG POUND trademark prior to 1994, in fact there are no such uses. Instead, that term, as opposed to "dawgs," is used rarely and then only in association with the Cleveland Browns marks and logos, exclusively as a graphic image or in the text of a document. For example, the use of the term "dawg pound" on the greeting cards, photographic images of which are attached as exhibits to the Declaration of Andrew Noch, submitted by the Defendants is purely decorative. It typifies their nontrademark use of the term.

---

[3]Without exception, NFLP required its licensees, as a condition to obtaining a license, to submit artwork for approval. (*See* Composite Ex. L; Ex. P., ¶ 4 (NFLP 07091).)

7

### B. THE DAWG POUND AND THE BROWNS FROM AND AFTER 1998

When the NFL determined to return a franchise to Cleveland to play during the 1999 football season, the attitude of the NFL with respect to the DAWG POUND trademark changed dramatically. On April 9, 1999, Mr. Carmen A. Policy, president of the Browns, submitted on behalf of the Browns an "intent-to-use" application for the mark DAWG POUND. (Ex. D.) His affidavit recites that "no other person, firm, corporation or association has the right to use said mark in commerce" when in fact he knew, as a result of the Browns' opposition to HP's application for the mark in 1995, that HP claimed priority of use. The reason he was prepared to submit an obvious falsehood under oath is the importance that the DAWG POUND mark and its attendant prospective licensing revenues had assumed once it was determined that the Browns would return to Cleveland. Prior to that time NFLP/the Browns had not opposed HP's registrations of the marks TOP DAWG and LIL DAWG POUND, despite the obvious similarity to DAWG POUND.

Significantly, when the Browns moved to Baltimore, certain assignments of trademarks were executed on behalf of the Baltimore Ravens (the successors to the Cleveland Browns (*see* Ex. J.)) in favor of an entity known as the Browns Holding Trust, Paul J. Tagliabue, trustee. Attached as Composite Ex. E are copies of the assignment documents. In none of those assignment documents is there any reference to DAWG POUND as one of the trademarks being assigned. (*See* pages CB 182, 183, 188, 190, 192, 194, 284, 287, 290, 293, 301, 303, 306.) If, as NFLP/the Browns now claim, the Browns/Ravens owned the DAWG POUND mark, surely it would have been assigned along with every other mark claimed by the former Cleveland Browns. The NFL was diligently trying to create the impression that the "new Browns" were but a continuation of the "old Browns," and to do so, the NFL sought to connect the "new Browns" with the storied past of the "old" Browns. It was only then that NFLP/the Browns saw the value of the "dawg pound" association, which would,

by a process akin to transubstantiation, be converted into an ancient Browns' trademark. The problem for the NFL, of course, was HP's claim of priority to the mark and existing registrations. Hence, the attempt by the Browns to register PUPPY POUND and to seek cancellation of HP's marks, which had been in use continuously since at least 1994.

In a press release dated April 17, 1999, Ex. F, the NFL announced "a new official logo that honors one of the most passionate fan groups in all of sports—the Dawg Pound." This announcement had been preceded in Cleveland by a promotion called the "Cleveland Browns Dawg Pound Promotion 1998 Rollout." (Composite Ex. G (*see* page marked NFLP 04486).) For the first time, DAWG POUND is used by NFLP/the Browns as something resembling a trademark, but even there the term is not used except with the mark CLEVELAND BROWNS and/or the Browns' distinctive team trade dress colors of orange and brown. The Browns proclaimed their use of their "first ever secondary logo"—the Cleveland Browns Dawg. (*See* page marked NFLP 04514.) The "new dawg pound" is contrasted there with the "old dawg pound," which was only a location in the stadium. (*See* page marked NFLP 04515.) Also filed herewith and marked Ex. H is a "logo slick" dated 4.16.99 that illustrates the Browns' proposed use of "dawg pound." Significantly, there is no trademark notice, but it does carry a copyright notice. Again, if NFLP/the Browns claimed trademark protection for the DAWG POUND mark, surely a trademark notice (TM) would have appeared prominently on the slick. (*See* Exs. N, O.)

In connection with the "rollout" of the new Browns club, the Browns applied to register the mark PUPPY POUND on August 28, 1999. Attached as Composite Ex. I is the file wrapper of the application. The examiner, not surprisingly, refused registration because of the risk of confusion with HP's registered LIL DAWG POUND mark. (*See* page marked NFLP 07411.) Again, the conclusion is inescapable that NFLP/the Browns, absent HP's priority of use, could claim rights in

9

the DAWG POUND mark only after 1998, at the earliest, when the Browns returned to Cleveland. Before 1996, the use by the Browns of "dawg," "dog," "dawg pound," and related terms was entirely indiscriminate and never with any attempt to use those terms as trademarks to identify the source of goods and services. If the Browns had intended to claim protection for the DAWG POUND mark, they would have sought registration of the mark with the State of Ohio. The Browns did not do so, clearly because NFLP/the Browns knew that the only protectable element of CLEVELAND BROWNS DAWGS or CLEVELAND BROWNS DOGS, was CLEVELAND BROWNS.

Most compelling of all is Mr. Policy's ITU applications for the DAWG POUND and PUPPY POUND marks. If NFLP/the Browns really believed that they had the prior right to own and use the DAWG POUND mark from and after about 1985, Mr. Policy would hardly have filed an ITU application in 1999, particularly when he had actual knowledge of HP's claim of priority from and after 1994. The position of NFLP/the Browns is simply contradicted by the clear and unmistakable record in this case.

## CONCLUSION

Thus, and for all the foregoing reasons, it is evident that there are no material facts in dispute, and that HP is entitled to judgment as a matter of law on the issue of priority of use in International Class 25 for the mark DAWG POUND. Accordingly, HP's motion for partial summary judgment should, in all respects, be granted.

    Respectfully submitted,

    /s/ Christine Karol Roberts

    _____
    Christine Karol Roberts, CR 0669
    Law Offices of Christine Karol Roberts
    1109 West Twenty-first Street
    Floral Park, California 92706
    Telephone: (714) 479-0024
    Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I, CHRISTINE KAROL ROBERTS, do hereby certify that a copy of the foregoing memorandum was served on opposing counsel this 8th day of July 2005, by mailing a copy of the same, prepaid Federal Express and by electronic transmission, to the following addressee:

Robert L. Raskopf, Esquire
White & Case, L.L.P.
1155 Avenue of the Americas
New York, New York  10036-2787

/s/ Christine Karol Roberts
_____
Christine Karol Roberts