UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAWAII-PACIFIC APPAREL GROUP, INC., <br><br> Plaintiff/Counterclaim Defendant, <br><br> -against- <br><br> CLEVELAND BROWNS FOOTBALL COMPANY LLC and NATIONAL FOOTBALL LEAGUE PROPERTIES, INC., <br><br> Defendants/Counterclaim Plaintiffs. | Case No.: 04 CV 7863 (DC) |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT ON PRIORITY OF USE IN
INTERSTATE COMMERCE[*]**

Robert L. Raskopf (RR-5022)
Jennifer J. Millones (JM-3470)
Jessica A. Rose (JR-4300)
**WHITE & CASE**LLP
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
E-mail: rraskopf@whitecase.com
E-mail: jmillones@whitecase.com
E-mail: jarose@whitecase.com

---

[*] Defendants have filed this document electronically.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

PRELIMINARY STATEMENT ..................................................................1

ARGUMENT ............................................................................................2

I.    THE UNDISPUTED EVIDENCE DEMONSTRATES THAT THE BROWNS SOLD DAWG POUND T-SHIRTS WELL BEFORE HP'S ALLEGED PRIORITY DATE ................................................................2

II.    HP ADMITS THAT THE PUBLIC ASSOCIATES THE DAWGS AND DAWG POUND MARKS WITH THE BROWNS.................................3

III.    HP MISSTATES THE LAW AND THE FACTS, CONTRADICTS ITSELF AND DISCUSSES IRRELEVANT ISSUES ...........................4

    A.    HP Does Not Enjoy a Presumption of Priority ............................4

    B.    The DAWGS Mark is Not Generic.................................................6

    C.    The Browns Club Has Used the DAWG POUND and DAWGS Marks as Trademarks .......................................................................7

        1.    "Analogous Use" is Trademark Use ..................................7

        2.    Use by The Browns and NFLP in Publications and Films is Trademark Use....................................................................9

        3.    Usages of the DAWG POUND Mark are Not Merely Illustrative as HP Claims ................................................10

        4.    Use of Advertising Slogans is Trademark Use ..............11

        5.    No Adverse Inference is Drawn from the Lack of a Federal Application for Registration ........................................12

    D.    The Browns Club Has Not Abandoned the DAWG POUND and DAWGS Marks.........................................................................13

        1.    The Law Does Not Permit the Negative Inferences HP Seeks......13

        2.    The Browns' Use of the DAWG POUND Mark from 1995 until 1999 is Irrelevant to a Determination of Priority .................14

    E.    Use by Licensees Inures to the Benefit of the Trademark Owner ............16

CONCLUSION........................................................................................18

## TABLE OF AUTHORITIES

### CASES

Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4 (2d Cir. 1976) ..............................6

Adolphe Lafont, S.A. v. S.A.C.S.E. Societa Azioni Confezioni Sportive Ellera, S.p.A.,
    228 U.S.P.Q. 589 (T.T.A.B. 1985) ......................................................................................15

Am. Stock Exch., Inc. v. Am. Express Co., 207 U.S.P.Q. 356 (T.T.A.B. 1980) ...........................8

Arthur Guinness, Son & Co. v. Oscar Von Bernuth, Inc., 14 F. Supp. 210 (S.D.N.Y.
    1923) ...................................................................................................................................8

Boston Athletic Ass'n v. Sullivan, 867 F.2d 22 (1st Cir. 1989) .....................................................8

Coca-Cola Co. v. Busch, 44 F. Supp. 405 (E.D. Pa. 1942) ...........................................................8

Compton v. Fifth Ave. Ass'n, Inc., 7 F. Supp. 2d 1328 (M.D. Fla. 1998) .....................................5

Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358 (2d Cir. 1959) .................................16

In re Expo '74, 189 U.S.P.Q. 48 (T.T.A.B. 1975) ........................................................................11

Gen. Cigar Co., Inc. v. G.D.M. Inc., 988 F. Supp. 647 (S.D.N.Y. 1997)....................................15

Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331
    (2d Cir. 1975)....................................................................................................................12

Housing & Servs., Inc. v. Minton, No. 97 Civ. 2725 (SHS), 1997 WL 349949 (S.D.N.Y.
    June 24, 1997)......................................................................................................................4

Hydro-Dynamics, Inc. v. George Putnam & Co., Inc., 811 F.2d 1470 (Fed. Cir. 1987)................5

Ithaca Indus., Inc. v. Essence Communications, Inc., 706 F. Supp. 1195 (W.D.N.C. 1986) .. 10-11

Johnny Blastoff Inc. v. Los Angeles Rams Football Co., 48 U.S.P.Q. 2d 1385 (W.D. Wis.
    1998), aff'd, 188 F.3d 427 (7th Cir. 1999) ...........................................................................8

Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 15 F. Supp. 2d  389 (S.D.N.Y.
    1998) ....................................................................................................................4, 5, 6, 15

Liebowitz v. Elsevier Sci. Ltd., 927 F. Supp. 688 (S.D.N.Y. 1996)..........................................3, 8

Malletier v. Dooney & Bourke, Inc., 340 F. Supp. 2d 415 (S.D.N.Y. 2004) .................................5

In re Marriott Corp., 517 F.2d 1364 (C.C.P.A. 1975) .................................................................11

Md. Stadium Auth. v. Becker, 806 F. Supp. 1236 (D. Md. 1992).............................................8, 10

MicroStrategy, Inc. v. Motorola, Inc., 245 F.3d 335 (4th Cir. 2001) ...............................9

Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Editors, Inc., 937 F.2d 1572 (Fed. Cir. 1991) ............................................................................................................................8

Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc., 198 F. Supp. 2d 474 (S.D.N.Y. 2002) ............................................................................................... 12-13

Nat'l Football League Props., Inc. v. Consumer Enters., Inc., 327 N.E.2d 242 (Ill. App. Ct.), cert. denied, 423 U.S. 1018 (1975) ...................................................................10

Nike, Inc. v. "Just Did It" Enters., 6 F.3d 1225 (7th Cir. 1993) ...................................12

Norac Co., Inc. v. Occidental Petroleum Corp., 197 U.S.P.Q. 306 (T.T.A.B. 1977).....................8

Pieper v. Playboy Enters., Inc., 179 U.S.P.Q. 318 (T.T.A.B. 1973).............................. 8-9

Pirone v. MacMillan, Inc., 894 F.2d 579 (2d Cir. 1990) ...............................................11

Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188 (11th Cir. 2001) ...............5

ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedia and Sports Physical Therapy P.C., 314 F.3d 62 (2d Cir. 2002)................................................................................14

Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455 (4th Cir. 1996)..............................14

Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037 (2d Cir. 1980) .........................15

Stetson v. Howard D. Wolf & Assocs., 955 F.2d 847 (2d Cir. 1992) ............................15

Tactica Int'l, Inc. v. Atl. Horizon Int'l Inc., 154 F. Supp. 2d 586 (S.D.N.Y. 2001)...............5

Time, Inc. v. Petersen Publ'g Co. L.L.C., 173 F.3d 113 (2d Cir. 1999)........................12

Turner v. HMH Publ'g Co., 380 F.2d 224 (5th Cir. 1967)..............................................16

Univ. Book Store v. Univ. of Wis. Bd. of Regents, 33 U.S.P.Q. 2d 1385 (T.T.A.B. 1994) ...........8

Volkswagenwerk Aktiengesellschaft v. Thermo-Chem Corp., 185 U.S.P.Q. 561 (T.T.A.B. 1975) ............................................................................................................8

Weight Watchers Int'l, Inc. v. Stouffer Corp., 744 F. Supp. 1259 (S.D.N.Y. 1990)............... 16-17

Windows User, Inc. v. Reed Business Publ'g Ltd., 795 F. Supp. 103 (S.D.N.Y. 1992).................4

## STATUTES

15 U.S.C. § 1055...............................................................................................................16

15 U.S.C. § 1127.........................................................................................................10, 11, 15, 16

**OTHER**

3 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, § 19 (4th ed. 1997) ............................................................................................................................5, 13

Defendant/Counterclaim Plaintiff Cleveland Browns Football Company LLC (the "Cleveland Browns," the "Browns" or the "Browns Club") and NFL Properties LLC, as successor-in-interest to Defendant/Counterclaim Plaintiff National Football League Properties, Inc. ("NFLP"), by their attorneys White & Case LLP, submit this Memorandum of Law in opposition to Plaintiff/Counterclaim Defendant Hawaii-Pacific Apparel Group, Inc.'s ("HP") Motion for Partial Summary Judgment on Priority of Use in Interstate Commerce.

## PRELIMINARY STATEMENT[1]

This case is ready for resolution in favor of the Browns and NFLP because HP cannot meet its burden of proving that it has prior rights to the DAWG POUND mark. The undisputed facts demonstrate that the Browns Club has trademark priority over HP in the DAWG POUND mark. The Browns and NFLP have submitted substantial evidence of use of the mark by the media, the public, the Browns, NFLP and its licensees in the 1980s, all inuring to the benefit of the Browns.

HP, on the other hand, admits that it did not begin shipping goods bearing the mark until the middle of the following decade, 1994. Recognizing the weakness of its position on the essential issue of trademark priority, HP resorts to making several ill-founded legal arguments (which the Browns and NFLP dispose of below) in an effort to stave off the inescapable conclusion that the undisputed facts compel here—that the Browns Club has trademark priority.

---

[1] The specific, undisputed facts supporting the Browns and NFLP's Motion for Partial Summary Judgment on Trademark Priority and in opposition to HP's Motion for Partial Summary Judgment on Priority of Use in Interstate Commerce are set forth in the Browns and NFLP's Local Civil Rule 56.1 Statement of Material Facts on Motion for Partial Summary Judgment on Trademark Priority, the Browns and NFLP's Supplemental Local Civil Rule 56.1 Statement of Material Facts on Motion for Partial Summary Judgment on Trademark Priority (collectively, "Statement"), the declarations of Ann McDowell, David Proper, Dino Lucarelli, Andrew Noch, Angela Ivie, John Barkes, Dan Gauchat and Marques Tracy and the exhibits submitted in support thereof. The Browns and NFLP summarized the facts in their Memorandum of Law in Support of their Motion for Partial Summary Judgment on Trademark Priority.

Accordingly, because a plaintiff in a trademark case cannot succeed without establishing

trademark priority over the defendant, the Browns and NFLP are entitled to judgment against HP

on the following Counts in HP's Complaint:  Count I (Section 43(a) trademark infringement),

Count II (Section 43(a) unfair competition) and Count III (state common law unfair

competition); and on Count I of the Browns and NFLP's Counterclaims (declaration of non-

infringement).

**ARGUMENT**

I.  **THE UNDISPUTED EVIDENCE DEMONSTRATES THAT THE BROWNS
    SOLD DAWG POUND T-SHIRTS WELL BEFORE HP'S ALLEGED PRIORITY
    DATE**

The undisputed facts demonstrate that the Browns sold t-shirts bearing the DAWG

POUND trademark to retailers at least four and a half years before HP alleges to have sold such

shirts.  HP acknowledges that, notwithstanding that the events in question occurred nearly two

decades ago, NFLP has produced two Retail Sales Reports[2] showing that from October 1, 1989

through November 30, 1989, Trench Manufacturing Co., Inc., then one of NFLP's licensees, sold

176 "units" of DAWG POUND t-shirts and sweatshirts to retailers at a price of $15,108.60 and

---

[2]  HP attempts to cast doubt on these Reports by stating that "the mere fact that 'dawg pound'
or 'top dawg' is mentioned somewhere on the document obviously proves nothing." (HP's
Br. at 10.)  Yet, its own invoice submitted to the Court on its Motion also only mentions
"dawg pound" "somewhere" on it. (HP's Ex. E.)  HP neglects to submit even one product
sample showing how it employed the DAWG POUND mark.  The Browns Club, on the
other hand, submitted far more than a single document: over two thousand pages of records
and reports and two DVDs, as well as eyewitness testimony. (See generally Statement ¶¶ 1-
42, 49 (citing McDowell Decl., Proper Decl., Lucarelli Decl., Noch Decl., Ivie Decl., Barkes
Decl., Gauchat Decl. and Tracy Decl).)  In fact, HP endorses these submissions by
submitting them in its papers, including in Exhibits O-1, O-2, P-1, P-2, Q-1, Q-2, Q-3, Q-4
and S.

171 "units" of TOP DAWG t-shirts and sweatshirts to retailers at a price of $14,631.05.[3]  (HP's

Br. at 10, Exs. M, N.)  HP also submits that its first shipment of DAWG POUND shirts was on

or about May 6, 1994 to a Hawaii retailer, by relying on an invoice that apparently[4] shows that

on May 6, 1994, HP shipped 208 DAWG POUND shirts at a total price of $756.00.  (HP's Br. at

5.)  HP itself cites to the fact that "ownership of a mark and the exclusive right to a mark belongs

to the one who first uses the mark on goods placed on the market."  (HP's Br. at 12.)

Accordingly, by its own legal argument, ownership of the DAWG POUND and TOP DAWG

marks and the exclusive rights to these marks belongs to the Browns.[5]

## II.     HP ADMITS THAT THE PUBLIC ASSOCIATES THE DAWGS AND DAWG POUND MARKS WITH THE BROWNS

HP's unsupported argument notwithstanding, it is entirely material—and in fact

determinative—that "the public may associate the term 'dawgs' or 'dawg pound' with the

Browns."[6]  (HP's Br. at 11.)  In fact, this Court has held that "[t]he 'talismanic test' for sufficient

---

[3]   Without any evidence, HP claims in a footnote "the mark TOP DAWG … clearly belongs exclusively to HP."  (HP's Br. at 10 n.7.)  However, the only thing that is "clear" is that the Browns used this mark in commerce before HP did.

[4]   HP provides no explanation of the contents of this document and it is does not lend itself to easy interpretation.

[5]   Despite these facts, HP falsely states "the first commercial sale of a product using the mark [DAWG POUND] in International Class 25 [*i.e.*, clothing] was by HP."  (HP's Br. at 17.)  Similarly, HP asks "where is there a trademark use of the term [DAWG POUND] in International Class 25 . . .?"  (Id. at 19.)  While HP inexplicably that "[t]he answer, quite simply, is that there is none," (id.) the facts reveal that, at the very least, there is $15,108.60 worth of trademark use of the term DAWG POUND in International Class 25 four and a half years before HP even got started.

[6]   HP quotes at length from Liebowitz v. Elsevier Sci. Ltd., 927 F. Supp. 688, 698 & n.15 (S.D.N.Y. 1996), in support of this untenable argument.  (HP's Br. at 11.)  However, Liebowitz supports the Browns and NFLP's position because it holds that the ownership of a trademark belongs to "whoever controls the quality" of the goods at issue.  Id. at 696; see

(continued…)

prior use in commerce is whether a person's use of the mark was 'sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 15 F. Supp. 2d 389, 396 (S.D.N.Y. 1998) (Chin, J.) (quoting Housing & Servs., Inc. v. Minton, No. 97 Civ. 2725 (SHS), 1997 WL 349949, at *3 (S.D.N.Y. June 24, 1997)). In fact, HP's citation of Windows User, Inc. v. Reed Business Publ'g Ltd., 795 F. Supp. 103, 109 (S.D.N.Y. 1992), stands for this exact proposition, that is, "[a]lthough advertisements and promotional activities may be relied on to demonstrate priority in use of a mark, this is the case only where it can be shown that such activity was 'of a nature and extent such as to create an *association of the term with the user's goods*.'"[7] (HP's Br. at 18 (emphasis added).) Thus, the fact that HP admits that the public associates the DAWGS and DAWG POUND marks with the Browns seals its fate.

### III.  HP MISSTATES THE LAW AND THE FACTS, CONTRADICTS ITSELF AND DISCUSSES IRRELEVANT ISSUES

#### A.  HP Does Not Enjoy a Presumption of Priority

HP wrongly claims that it enjoys a "presumption of priority" because it owns a registration for the mark LIL DAWG POUND. (HP's Br. at 7.) For this misstatement of the law, HP cites this Court's decision in Lane Capital Mgmt., 15 F. Supp. 2d at 389. However, even the parenthetical quoted by HP does not support the proposition. (See HP's Br. at 7.) Rather, Lane stands for the proposition that a registration constitutes prima facie proof of the

---

(...continued)

also discussion infra Part III.E. Otherwise, Liebowitz is so factually dissimilar from this case as to be inapplicable.

[7]  HP's quote from Windows User goes on to say, "it is beyond cavil that the actual sale to the public of defendant's magazine under the mark 'Windows User' was activity which would create an association in the mind of the consumer public between defendant and said mark." (HP's Br. at 18.) This quote further supports the Browns and NFLP's claim of priority as established supra Part I.

mark's validity.[8] Lane Capital Mgmt., 15 F. Supp. 2d at 394. The issue of validity is not before this Court. The relevant issue is which party obtained priority. In fact, HP later contradicts its own argument by stating, "registration of a mark, unaccompanied by prior use, does not create ownership." (HP's Br. at 9 (citing Hydro-Dynamics, Inc. v. George Putnam & Co., Inc., 811 F.2d 1470, 1473 (Fed. Cir. 1987); Tactica Int'l, Inc. v. Atl. Horizon Int'l Inc., 154 F. Supp. 2d 586, 599 (S.D.N.Y. 2001); Compton v. Fifth Ave. Ass'n, Inc., 7 F. Supp. 2d 1328, 1331 (M.D. Fla. 1998); 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:3 (4th ed. 1997)).) Thus, HP's registration for LIL DAWG POUND, unaccompanied by prior use, does not create ownership in that mark.

   To prevail on its claims for trademark infringement under Section 43(a) of the Lanham Act, unfair competition under the same Section 43(a) and unfair competition under state common law, HP (not the Browns or NFLP) has the burden of showing that it has prior rights to the mark it claims to be infringed. See, e.g., Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 (11th Cir. 2001) ("To prevail under . . . section [43(a)], a claimant must show . . . that it had prior rights to the mark at issue"); Malletier v. Dooney & Bourke, Inc., 340 F. Supp. 2d 415, 436 (S.D.N.Y. 2004) ("The elements necessary to prevail on common law cause[] of action for ... unfair competition mirror the Lanham Act claims.") (citations and internal quotations omitted). As discussed supra Parts I and II, HP has not proven priority; the opposite is the case.

---

[8]   "Validity" requires the Court to categorize the designation in question—specifically, whether the designation is (1) fanciful; (2) arbitrary; (3) suggestive; (4) descriptive or (5) generic. Lane Capital Mgmt., 15 F. Supp. 2d at 393-94. By contrast, "priority" requires the court "to identify the senior user." Id. at 396. In Lane Capital Mgmt., this Court addressed those "validity" and "priority" issues separately. Id. at 393-97.

B.    **The DAWGS Mark is Not Generic**

HP states that "the term 'dawg' . . . is not protectable as a trademark . . . by anyone," claiming that the term is generic.[9] (HP's Br. at 1, 13.) For this untenable proposition, HP once again cites this Court's decision in Lane Capital Mgmt., 15 F. Supp. 2d at 394.[10] However, Lane stands for the opposite proposition, that is, a word used in one context for its common meaning may be used in another context in an arbitrary way. 15 F. Supp. 2d at 394. Indeed, in Lane, this Court found that the term "lane" which has the common meaning of a "narrow path" is arbitrary when used in connection with investment services. Id. at 395. Likewise, the DAWG and DAWG POUND marks are at least arbitrary, and likely fanciful,[11] when used in connection with the goods and services of Cleveland Browns football club and thus, clearly protectable as

_____

[9]    HP also claims that the only reason the Browns could license the DAWGS mark is because it is part of "the mark CLEVELAND BROWNS DAWGS, . . . [which] is derivative of the mark CLEVELAND BROWNS." (HP's Br. at 22.) This statement is not supported by the facts, as some of the Browns' licensees produced DAWGS products without the use of CLEVELAND BROWNS mark. (See, e.g., Statement ¶¶ 23, 31 (citing McDowell Decl. Ex. 12 (pins), Ex. 23 (hand-held vacuum cleaners), Ex. 33 (t-shirts)).) Moreover, if the DAWGS mark is derivative of the CLEVELAND BROWNS mark, then obviously so is the DAWG POUND mark.

[10]    HP also cites to a June 30, 1988 letter from the Secretary of State of Ohio to the Browns, falsely claiming that "[t]he Browns have already been advised by the State of Ohio that the putative mark 'dawgs' is generic and not susceptible of protection." (HP's Br. at 12, 14, 16.) Not once in this letter does the State of Ohio claim that the mark DAWGS is generic; in fact, it says the opposite. This letter acknowledges that the DAWG mark can be a trademark as evidenced by the registration for the corporate title DAWG, INC. and specifically states that it "makes no determination concerning which entity has superior rights to the word 'Dawg.'" (HP's Ex. D.)

[11]    As a domestic mammal and common household pet employs the generic name "dog," the unusual spelling of "dawg," makes it a fanciful rather than arbitrary mark as the term fanciful typically refers to *invented* words used as trademarks. See Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 11 n.12 (2d Cir. 1976).

trademarks.[12] Lane Capital Mgmt., 15 F. Supp. 2d at 394 ("Arbitrary, fanciful, or suggestive marks are viewed as 'inherently distinctive,' and are entitled to full and immediate protection under the Lanham Act.").

Contrary to HP's claim that the Browns can only prevail by dissecting the DAWG POUND mark, and then claiming rights in the DAWG component (HP's Br. at 15-16), the purpose of the Browns and NFLP's submission concerning the DAWGS mark was to provide the genesis of the DAWG POUND mark. Once the DAWGS were born, the DAWG POUND shortly followed. The immediate association between the DAWGS mark and the Browns did of course make public association between the DAWG POUND mark and the Browns that much more immediate and automatic, but this proof merely bolsters the other proof of record of DAWG POUND as a brand of the Browns.

C.    **The Browns Club Has Used the DAWG POUND and DAWGS Marks as Trademarks**

1.    **"Analogous Use" is Trademark Use**

HP incorrectly claims that there is "no legal or other support" for the position that public use and association of a term in reference to or in connection with a company and/or its goods or services inures to the company's benefit and creates rights in the term for the company.[13] (HP's

---

[12] Curiously, HP cites the DEPUTY DAWG trademark registration to support its claim that "dawg" is *not* protectable as a trademark. (HP's Br. at 1 n.3.) First, the United States Patent and Trademark Office only issues registrations for *trademarks*, thus DEPUTY DAWG is clearly protectable as a trademark. Second, HP undoubtedly believed the DEPUTY DAWG mark was protectable as it agreed to refrain from using its TOP DAWG mark on certain goods and services to avoid litigation with the owner of the DEPUTY DAWG trademark. (Statement ¶ 49 (citing Tracy Decl. Ex. F).)

[13] HP also claims that the use by the media and the public of the DAWG POUND mark to refer to "the Cleveland Browns football club and their fans" is a "nontrademark use." (HP's Br. at 18-19.) As the lack of case law citation clearly demonstrates, this proposition has no

(continued...)

Br. at 11.) However, the Browns' Memorandum of Law clearly sets forth the legal support for this well-established principle.[14] (See Browns' Br. at 8-9 (citing Johnny Blastoff, Inc. v. Los Angeles Rams Football Co., 188 F.3d 427, 433-35 (7th Cir. 1999); Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Editors, Inc., 937 F.2d 1572, 1577-78 (Fed. Cir. 1991); Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 27-28 (1st Cir. 1989); Johnny Blastoff Inc. v. Los Angeles Rams Football Co., 48 U.S.P.Q.2d 1385, 1396-97 (W.D. Wis. 1998), aff'd, 188 F.3d 427 (7th Cir. 1999); Md. Stadium Auth. v. Becker, 806 F. Supp. 1236, 1239-40 (D. Md. 1992); Coca-Cola Co. v. Busch, 44 F. Supp. 405, 408 (E.D. Pa. 1942); Arthur Guinness, Son & Co. v. Oscar Von Bernuth, Inc., 14 F. Supp. 210, 211 (S.D.N.Y. 1923); Univ. Book Store v. Univ. of Wis. Bd. of Regents, 33 U.S.P.Q.2d 1385, 1392 n.21 (T.T.A.B. 1994); Am. Stock Exch., Inc. v. Am. Express Co., 207 U.S.P.Q. 356, 364 (T.T.A.B. 1980); Norac Co., Inc. v. Occidental Petroleum Corp., 197 U.S.P.Q. 306, 315 (T.T.A.B. 1977); Volkswagenwerk Aktiengesellschaft v. Thermo-Chem Corp., 185 U.S.P.Q. 561, 561 (T.T.A.B. 1975); Pieper v. Playboy Enters., Inc., 179 U.S.P.Q.

---

(...continued)

support in the law. A trademark can be used to identify a wide variety of goods and services, including services in International Class 41, i.e., entertainment services in the nature of professional football games. In fact, the United States Patent and Trademark Office has issued more than one hundred registrations to the NFL and its Member Clubs for the use of their marks in connection with entertainment services. See, e.g., the San Diego Chargers' Registration No. 2,808,017 for the mark THUNDER ZONE for use in connection with "education and entertainment services in the nature of organizing and presenting professional football games and exhibitions;" the Browns' Registration No. 1,262,689 for Cleveland Browns helmet design mark for use in connection with "entertainment services in the form of professional football games and exhibitions;" and the Browns' Registration No. 1,226,244 for the mark BROWNS for use in connection with "entertainment services in the form of professional football games and exhibitions".

[14] HP's alleged legal support for the inverse of this well-established proposition is from Liebowitz, 927 F. Supp. at 698 & n.15. However, Liebowitz only states the general proposition that the source of trademarked goods is the company that controls the quality of the goods. Id.

318, 320 (T.T.A.B. 1973)).) Accordingly, the hundreds of uses of the marks DAWG POUND

and DAWGS to refer to the Browns and their goods and services beginning in October 1985

undoubtedly inure to the Browns' benefit and create rights in the DAWGS and DAWG POUND

marks for the Browns.[15]

### 2. Use by The Browns and NFLP in Publications and Films is Trademark Use

As stated in its Memorandum of Law, NFLP has used the DAWG POUND mark in

"Cleveland Browns Highlight Films," since at least as early as 1988, and in *GameDay*, the

official magazine of the National Football League (the "NFL"), since at least as early as

December 16, 1990. (See Browns' Br. at 6.) The Browns Club also has used the DAWG

POUND mark in several of its publications, including its Training Camp Programs, its Preview

magazines, its Fan and Media Guides, its Official Yearbooks and its printed schedules since at

least as early as 1990. (Id.) HP claims that these uses "are not uses of a trademark."[16] (HP's

---

[15] HP tries to distinguish this case from the "franchise relocation" cases by suggesting that upon relocation, a sports franchise maintains rights only in its primary trademarks. (HP's Br. at 13.) Nothing in Blastoff, or any of the other "franchise relocation" cases (or in the logic of the concept) suggests that owners' property rights are so limited. To the contrary, in Blastoff, the court states that "abbreviations and nicknames of trademarks or names used only by the public give rise to protectable rights in the owners of the trade name or mark," suggesting that a team's entire portfolio of trademarks are protectable, not solely the team name, and also suggesting that even a name not in use but associated by the public with the team is protectable team property. 188 F.3d at 434. This Court need not consider that issue as abundant use of the DAWG POUND mark is contained in this record.

[16] HP's reliance on MicroStrategy, Inc. v. Motorola, Inc., 245 F.3d 335, 341-42 (4th Cir. 2001), is misplaced. In MicroStrategy, the court found the plaintiff's minimal use of the phrase "Intelligence Everywhere" within the body text of 24 documents such as annual reports and press releases, without more, did not constitute trademark use. Id. In sharp contrast to these facts, NFLP and the Browns have used the trademark DAWG POUND in connection with the sale of a wide variety of merchandise, including t-shirts and other apparel, since the mid-1980s. (See Browns' Br. at 3.)

Br. at 13.) However, the law is to the contrary. See Md. Stadium Auth., 806 F. Supp. at 1239-40 (finding newsletters, brochures, and pamphlets distributed to press and public using words "Camden Yards" in text created rights in CAMDEN YARDS mark by distributor). This use clearly is "use in commerce," as that term is defined in the Lanham Act as "the bona fide use of a mark in the ordinary course of trade." 15 U.S.C. § 1127. Therefore, the Browns Club undoubtedly established trademark rights through its own use (independent of earlier, overwhelming media recognition discussed in its Memorandum of Law) in the DAWG POUND mark no later than 1988, which rights pre-date HP's alleged date of first use by several years.

3.    **Usages of the DAWG POUND Mark are Not Merely Illustrative as HP Claims**

The Browns' use of the DAWG POUND mark in a jigsaw puzzle is a trademark use, as is its use of the DAWG POUND mark on t-shirts and greeting cards and other goods. In fact, over thirty years ago, at a time when there was far less commercial activity in NFL Marks than there is today, a court determined that the trademarks of various Member Clubs of the NFL—of which the Browns Club was then a member as they are now—are not "merely decorative ornaments." See Nat'l Football League Props., Inc. v. Consumer Enters., Inc., 327 N.E.2d 242, 246 (Ill. App. Ct.), cert. denied, 423 U.S. 1018 (1975). In Consumer Enters., the court found that the Clubs' trademarks "indicate sponsorship or origin in addition to their ornamental value." [17] Id. "Words emblazoned on the front of T-shirts, on decals, and the like have been held to constitute trademarks" in other cases as well. Ithaca Indus., Inc. v. Essence Communications, Inc., 706 F.

---

[17]    Further, numerous registrations held by the NFL and its Member Clubs for goods in International Classes 25 and 28 have relied upon specimens showing exactly the same type of uses HP criticizes here. See, e.g., Registration No. 2,956,462 for lightning bolt design mark; Registration No. 2,762,202 for the mark TITAN UP; Registration No. 2,954,420 for the mark SUPER BOWL.

Supp. 1195, 1206 (W.D.N.C. 1986) (finding plaintiff's contention that use of ESSENCE on T-shirts was not trademark usage without merit) (citing In re Expo '74, 189 U.S.P.Q. 48, 49 (T.T.A.B. 1975)). In fact, the Lanham Act provides that a mark may be placed "in any manner on the goods". 15 U.S.C. § 1127. Thus, the Lanham Act is "broad enough to encompass the affixation of a mark across the front of a garment" and in a jigsaw puzzle. See In re Expo '74, 189 U.S.P.Q. at 49 (finding proposed EXPO '74 mark, as used on t-shirts, serves trademark function). "The question is not whether [the mark] is placed in the position or portion of the goods customarily employed in the trade for this purpose, but rather whether the mark, as used, performs the function of a trademark by signifying to purchasers and prospective purchasers the goods of a particular entity and distinguishing such goods from those of others." Id. at 50. In this case, the DAWG POUND mark, as used on the front of a t-shirt or in a jigsaw puzzle, undoubtedly performs the function of a trademark by signifying to purchasers or prospective purchasers that these t-shirts and jigsaw puzzles are sponsored or approved by the Cleveland Browns, and not someone else.[18]

### 4. Use of Advertising Slogans is Trademark Use

HP claims that the Browns' DAWGS and DAWG POUND marks are "equivalent to advertising slogans" and thus, somehow are not trademarks. (HP's Br. at 20.) However, well-recognized slogans become trademarks when they are not used in the context of their common

---

[18] This case is clearly distinguishable from Pirone v. MacMillan, Inc., 894 F.2d 579 (2d Cir. 1990). In Pirone, the Court found that mere photographs of Babe Ruth, a historical sports figure, did not indicate origin or represent sponsorship and thus, the use of these photographs was not trademark use. Id. at 584. Here, the Browns Club is not claiming trademark rights in photographs; rather it is claiming trademark rights in the words "DAWG POUND," which when applied to the front of a T-shirt or a jigsaw puzzle, clearly indicate origin or represent sponsorship.

meaning, but rather suggestively.  Witness the slogans: "Just do it!", <u>Nike, Inc.</u> v. <u>"Just Did It"</u>

<u>Enters.</u>, 6 F.3d 1225, 1226 n.2 (7th Cir. 1993), "Steinway—The Instrument of the Immortals,"

<u>Grotrian, Helfferich, Schulz, Th. Steinweg Nachf.</u> v. <u>Steinway & Sons</u>, 523 F.2d 1331, 1338 (2d

Cir. 1975), and "We Smile More," <u>In re Marriott Corp.</u>, 517 F.2d 1364, 1367 (C.C.P.A. 1975).

But HP cannot manage to keep its own arguments straight, for in its Memorandum of Law, it

refers to "It's The Real Thing," a slogan registered as a trademark in the United States Patent and

Trademark Office.  (<u>See</u> HP's Br. at 21 n.9.)

### 5.  No Adverse Inference is Drawn from the Lack of a Federal Application for Registration

HP suggests that this Court draw a negative inference from the fact that "[t]he Browns

waited to file intent-to-use applications for the mark DAWG POUND (the word mark plus

graphic images using the word mark) on March 26, 1999, pursuant to 15 U.S.C. § 1051(b), more

than a decade after NFLP/the Browns now claims the Browns first used the mark."  (HP's Br. at

4.)  As an initial matter, that the Browns might not have filed until some time after using the

DAWG POUND mark is no different from the behavior of HP, which admittedly did not file a

trademark application for the mark DAWG POUND until four years after its claimed date of first

use.  (HP's Br. at 3.)  Moreover, U.S. trademark law is a common law system.  Federal filings

are not mandatory.  Thus, the law does not support a negative inference for failing to file a

trademark application.  In fact, a trademark registration creates no substantive trademark rights

beyond those already established through common law use. <u>See</u> <u>Time, Inc.</u> v. <u>Petersen Publ'g</u>

<u>Co. L.L.C.</u>, 173 F.3d 113, 118 (2d Cir. 1999) ("As a general matter, registration creates no

substantive trademark rights against infringement beyond the common law rights acquired

through use of the mark."); <u>Nat'l Distillers Prods. Co., LLC</u> v. <u>Refreshment Brands, Inc.</u>, 198 F.

Supp. 2d 474, 480 n.8 (S.D.N.Y. 2002) (same). Thus, the fact that the Browns filed an

application at all shows that the Browns had an interest in this mark—not the inverse.

The filing of an intent-to-use application, rather than a use-based application, also is not

significant. (See HP's Br. at 16.) Filing of intent-to-use applications, rather than use-based

applications, is sometimes employed by trademark owners as a means of saving filings costs.[19]

In fact, given the popularity of intent-to-use applications, today only about one third of all

trademark applications are use-based. McCarthy, supra, § 19:1. In the case of the Browns'

March 26, 1999 trademark application, the Browns sought registration for more than three

hundred goods in seven international classes. If the Browns had filed a use-based application, it

could only seek registration for goods that were already in use. It would later have had to file

another intent-to-use application for those goods that were not yet in use, at an additional cost of

$325-$375 per international class. The Browns instead adopted the economically responsible

approach by filing an intent-to-use application for all of its previous and intended goods.

D.   **The Browns Club Has Not Abandoned the DAWG POUND and DAWGS Marks**

1.   **The Law Does Not Permit the Negative Inferences HP Seeks**

HP claims "it is a reasonable inference that because the Browns had departed Cleveland

in 1995, NFLP/the Browns lost interest in anything related to the now-departed Browns club."

(HP's Br. at 8.) HP claims that the Browns' lost interest is evidenced by (i) its failure to oppose

HP's application to register LIL DAWG POUND (id.); (ii) its failure to raise an objection to

HP's use of the mark DAWG POUND until 1994 (id. at 3); (iii) its failure to file a trademark

---

[19]   Despite HP's claim, the Browns and NFLP do not base the Browns' claim of priority on the filing of its intent-to-use application. (See HP's Br. at 16.) Thus, HP's entire discussion on pages 16 to 17 is immaterial.

application for the mark DAWG POUND until 1999 (id. at 13), and (iv) its failure to renew certain trademark applications (id. at 4, 12). This alleged "loss of interest," even if true—which it is not—is not relevant to the issue of priority because it post-dates HP's alleged date of first use. Further, (i) the Browns petitioned to cancel HP's registration for the mark LIL DAWG POUND on June 21, 1999; (ii) the Browns raised an objection to HP's use of the mark DAWG POUND as soon as it discovered its use, which is *more* than the law requires;[20] and (iii) as discussed supra Part III.C.5, the Browns need not file a trademark application at all. Moreover, concerning the Browns' failure to renew certain registrations, rather than showing that the Browns "lost interest in the 'dawg' concept," these registrations show that the Browns had an interest in these marks beginning in November 1985 and had exclusive rights to use them in the State of Ohio for a decade prior to HP's alleged date of first use. (See Statement ¶ 18 (citing McDowell Decl. ¶¶ 13, 15, Exs. 7, 8.).) Furthermore, these registrations were for design marks that could not be renewed unless the designs accompanying the word marks remained in use, which they did not. (Id.) Thus, no inference should be—nor legally could be—drawn from these immaterial facts.

2.    **The Browns' Use of the DAWG POUND Mark from 1995 until 1999 is Irrelevant to a Determination of Priority**

While HP claims that "[i]t bears emphasis that from 1995 until the 1999 season, there was no NFL franchise in Cleveland and no 'dawg pound' in Municipal Stadium" (HP's Br. at 5),

---

[20]    See ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedia and Sports Physical Therapy P.C., 314 F.3d 62, 70 (2d Cir. 2002) ("[A] plaintiff should not be obligated to sue until its right to protection has ripened such that plaintiff knew or should have known, not simply that defendant was using the potentially offending mark, but that plaintiff had a provable infringement claim against defendant."); Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 462 (4th Cir. 1996) (a trademark owner "has no obligation to sue until 'the likelihood of confusion looms large'" and his "right to protection [has] clearly ripened.").

and that "the use of the mark by NFLP/the Browns from and after 1994 until about 1998 was at most sporadic and incidental" (id. at 12), such information has no bearing on the issue of priority now before the Court, i.e., whether the Browns used the DAWGS and DAWG POUND marks in commerce before HP's alleged date of first use of January 1994.[21] HP's contention of even "sporadic and incidental" use, and its submission of cease and desist letters sent by NFLP on behalf of the Browns, rebuts any claim of abandonment. See, e.g., Gen. Cigar Co., Inc. v. G.D.M. Inc., 988 F. Supp. 647, 658 (S.D.N.Y. 1997) ("Intent to abandon has been confuted even where the period of non-use lasted longer than two years if the registrant made other efforts to maintain the commercial value of the mark during the period of non-use."); Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980) (finding no intent to abandon trademark, despite seven years of no sales where trademark holder had continuously attempted to sell business with its goodwill and trademarks); Adolphe Lafont, S.A. v. S.A.C.S.E. Societa Azioni Confezioni Sportive Ellera, S.p.A., 228 U.S.P.Q. 589 (T.T.A.B. 1985) (finding no abandonment where owner made no use of mark in seven years other than making two shipments).  To prove abandonment under the Lanham Act, HP must prove (1) non-use and (2) intent not to resume use. See Stetson v. Howard D. Wolf & Assocs., 955 F.2d 847, 850 (2d Cir. 1992).  Because it constitutes forfeiture of property right, abandonment of trademark must be proven by clear and convincing evidence. 15 U.S.C. § 1127; see Saratoga Vichy Spring, 625 F.2d at 1044.  This is obviously not the case here, as even HP admits that the Browns Club has

---

[21]    HP relies on Lane Capital Mgmt. to support this proposition. (HP's Br. at 12.) Once again, HP misconstrues Lane. In that case, this Court rejected the argument that the senior user's trademark use was only sporadic and therefore insufficient to establish priority, noting that "adoption and a single use of the mark" is sufficient to confer rights on the owner. 15 F. Supp. 2d at 397.

continued to use the DAWG POUND mark up to the present. Any lapse in use obviously would be excusable in a case where the activities of the Cleveland NFL franchise were interrupted for a time.[22]

### E.    Use by Licensees Inures to the Benefit of the Trademark Owner

In perhaps its most flagrant misstatement of the law, HP claims that "USE BY LICENSEES IS NOT USE BY OWNER OF MARK." (See HP's Br. at 21.) The Lanham Act specifically states: "Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration . . . ." 15 U.S.C. § 1055. The Lanham Act defines a "related company" as "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1127. Licensees are the prototypical "related companies". Turner v. HMH Publ'g Co., 380 F.2d 224, 226-27, 229 (5th Cir. 1967) (affirming trial judge's decision that licensees are related companies and holding that "the Lanham Act definitely contemplates that a trade or service mark may be acquired through its use by controlled licensees, even though the registrant itself may not have used the mark"); Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 367 (2d Cir. 1959) (finding plaintiff's licensees to be related companies under Lanham Act); Weight

---

[22]    Should the Court desire additional proof concerning the lack of abandonment of the Browns' marks during the brief window between Cleveland area NFL franchises (including documents evidencing the trust created to maintain the Browns Club's intellectual property rights until the team began play again in 1999) or the Browns' use of the DAWG POUND mark after 1999, Defendants would be pleased to provide it. However, HP's "abandonment" submissions are so weak that, if anything, the Court should additionally grant Defendants summary judgment on that issue. HP has been unable to raise a genuine issue of material fact as to abandonment.

Watchers Int'l, Inc. v. Stouffer Corp., 744 F. Supp. 1259, 1268 n.5 (S.D.N.Y. 1990) (same). NFLP's licensees are no exception.

The Browns and NFLP have introduced ample evidence to show that NFLP fully controlled and dictated the nature and quality of the goods used in connection with the DAWGS and DAWG POUND trademarks by its licensees. When NFLP grants a license to a company, the company is required to sign a Licensing Agreement, which specifically states:

> All Licensed Products and their packaging must receive quality control approval by NFLP. All Licensed Products will meet uniform standards of high quality, style, construction, and appearance set by NFLP. Licensee agrees that it will sell no Licensed Products unless an NFLP Licensed Product Quality Control Approval Form ("Product Approval Form") for that Product has been signed by NFLP, returned to Licensee, and remains in full force and effect. The following conditions and procedures will govern NFLP's issuance of Product Approval Forms:
>
> (a) Licensee will supply within 10 days of any request by NFLP, at no charge to NFLP, such reasonable number of samples of Licensed Products and their packaging as NFLP may require.
>
> (b) At NFLP's request, Licensee will present its complete line of Licensed Products to NFLP at a mutually agreeable time, date, and site.
>
> (c) NFLP will make best efforts to evaluate Licensed Product submissions within 45 days of their receipt by NFLP.
>
> (d) Licensee will not deviate from the standards of quality of samples upon which Product Approval Forms are based. Departure from such quality standards constitutes breach of a material term of this License. NFLP may purchase at Licensee's expense any Licensed Products found in the marketplace which in NFLP's judgement [sic] are inconsistent with approved quality standards and bill such costs to Licensee. Licensee must also pay all Royalties otherwise consistent with approved quality standards.
>
> (e) Product Approval Forms must be renewed annually by NFLP pursuant to the terms and conditions set forth above.

(Statement ¶ 23 (citing McDowell Decl. Ex. 11), ¶ 54.) NFLP and its licensees follow this quality control procedure. (Id. ¶ 55.) In fact, some of the correspondence applicable to this quality control process was submitted to the Court. (Statement ¶¶ 23, 31 (citing McDowell Decl.

Exs. 18, 20, 45, 49, 53; Noch Decl. Ex. 2; Ivie Decl. Exs. 2, 4; Barkes Decl. Ex. 7.).)  Thus, NFLP undoubtedly controlled the nature and quality of the goods on or in connection with which its licensees used the DAWGS and DAWG POUND marks.  Thus, HP's argument is yet another red herring.[23]

## **CONCLUSION**

In sum, HP's Memorandum of Law does nothing to change the fact that, as between the Browns and HP, the Browns Club has established priority in the DAWG POUND mark such that there is no issue of fact for a trial.  Accordingly, the Court should grant Defendants' Motion for Partial Summary Judgment on Trademark Priority on Count I, II and III of HP's Complaint and on Count I of the Browns and NFLP's Counterclaims.

Dated:    New York, New York
          July 8, 2005

Respectfully submitted,

Robert L. Raskopf (RR-5022)
Jennifer J. Millones (JM-3470)
Jessica A. Rose (JR-4300)

**WHITE & CASE**LLP
1155 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113

ATTORNEYS FOR
DEFENDANTS/COUNTERCLAIM
PLAINTIFFS

---

[23]    HP's discussions of its founder's intent on pages 2 and 3 of its brief and of confusion on page 7 have no relevance to the issue of priority before this Court.  Thus, the Browns and NFLP do not address these discussions.