UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
                                    :
HAWAII-PACIFIC APPAREL GROUP, INC.,
                                    :
              Plaintiff,                    **AMENDED OPINION**
                                    :
         - against -                        04 Civ. 7863 (DC)
                                    :
CLEVELAND BROWNS FOOTBALL
COMPANY LLC and NATIONAL            :
FOOTBALL LEAGUE PROPERTIES, INC.,
                                    :
              Defendants.
                                    :
- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**    LAW OFFICES OF CHRISTINE KAROL ROBERTS
                        By:  Christine Karol Roberts, Esq.
                    1109 West Twenty-First Street
                    Floral Park, CA  92706
                    Attorneys for Plaintiff

                    WHITE & CASE LLP
                        By:  Robert L. Raskopf, Esq.
                             Jennifer J. Millones, Esq.
                             Jessica A. Rose, Esq.
                    1155 Avenue of the Americas
                    New York, NY  10036
                    Attorneys for Defendants[1]

**CHIN, D.J.**

         Fans of the National Football League (the "NFL") have

since the early eighties associated the phrase "Dawg Pound" with

the particularly enthusiastic fans of the Cleveland Browns

football team who sat in the bleachers of the old Municipal

---

[1]    White & Case LLP, by Robert L. Raskopf, Jennifer J.
Millones, and Jessica A. Rose, appeared as counsel of record for
defendants at the time the briefs on these cross-motions were
fully submitted.  After the Court issued its opinion on February
14, 2006, Mr. Raskopf informed the Court in a letter that he is
now at the firm of Quinn Emanuel Urquhart Oliver & Hedges, LLP,
and he filed a notice of substitution of counsel to that effect.
The original opinion listed the appearances incorrectly and this
amended opinion is issued to reflect the appearances as of the
time the motions and motion papers were filed.

Stadium (where the Browns played until 1995), and who now sit in
the new Cleveland Browns Stadium (where the Browns have played
since 1999).  In the mid-nineties, plaintiff Hawaii-Pacific
Apparel Group, Inc. ("HP"), began to manufacture and market a
line of non-football-related apparel using the DAWG POUND phrase
as a mark.  In 1994, HP attempted to register the mark DAWG POUND
with the United States Patent and Trademark Office (the "PTO"),
but the application was opposed by defendant National League
Football Properties, Inc. ("NFLP"), and the mark was never
registered.  HP was, however, successful in registering the marks
TOP DAWG and LIL DAWG POUND in 1995 and 1996, respectively (in
unopposed applications), and eventually succeeded in selling
millions of dollars of its DAWG-related merchandise (including
DAWG POUND merchandise).

        In 1999, when the NFL was preparing to bring a Browns
franchise back to Cleveland after a four-year absence, NFLP filed
an intent-to-use application for the DAWG POUND mark with the
PTO.  The application was rejected because of its similarity to
HP's LIL DAWG POUND mark.  Now, more than twenty years after the
"Dawg Pound" was born, more than sixteen years after defendants
claim to have begun using the mark, more than ten years after HP
claims to have begun using the mark, and more than six years
after litigation of this issue commenced in Ohio, the parties
seek in this action to resolve once and for all which of them has
superior rights to the mark.

        On these cross-motions for partial summary judgment,

-2-

the principal issue is who came first -- whether the Browns and the NFLP or HP first used the DAWG POUND mark in commerce.  As I conclude that a reasonable jury could only find that the Browns and NFLP are the senior users, their motion for summary judgment is granted and HP's is denied, to the extent set forth herein.

**STATEMENT OF THE CASE**

### I.    The Facts

The facts in this case are largely not in dispute.  To the extent there is any dispute, they are construed in favor of HP, because I am denying its motion and granting defendants' motion.

#### A.    1984-1994

In 1984, Browns players and fans started to refer to the team's defense -- and, eventually, the team's fans -- as the "Dawg Pound."  (Lucarelli Decl. ¶ 5).  The phrase caught on quickly, and, in part as a result of the notoriety of the Dawg Pound, in the mid-eighties NFLP considered Cleveland to be a "hot market," as Browns-related merchandise was selling particularly well.  (McDowell Decl. ¶¶ 13-14).  In 1985, to capitalize on this market, NFLP asked the Browns[2] to register the marks CLEVELAND BROWNS DOGS and CLEVELAND BROWNS DAWGS with the State of Ohio Trademark Office.  (Id. ¶ 15).  CLEVELAND BROWNS DAWGS -- a mark

---

[2]    For purposes of this opinion, the "Browns" will be used interchangeably to refer to defendant Cleveland Browns Football Company LLC and the football team that it operates, unless otherwise necessary for purposes of clarity.

bearing those words and a design of three dogs in football uniforms -- was eventually officially registered by the State of Ohio in 1988, as was a similar design for CLEVELAND BROWNS DOGS. (Id.).  Each of these trademark registrations expired ten years after the date of its issuance.  (HP Ex. C).

One of the functions of NFLP was to license the trademarks of the NFL and its teams to third parties via licensing agreements.  (McDowell Decl. ¶ 4).  NFLP referred to these marks as "NFL Marks," and broke them down into five categories:

- "League Marks," which included marks such as "National Football League," "NFL," "Super Bowl," "Pro Bowl," and the like;

- "Club Marks," which included the names, symbols, designs, and colors of the various NFL teams;

- "Huddles," which included copyrighted team mascots helmet designs, and other indicia of the teams;

- "Superstars," which included special designs including Club Marks and the personal likenesses of one or more NFL players; and

- "Game Day," which were special design treatments of the Club Marks marketed in connection with the term "Game Day" and/or the League Marks.

(Id.).  NFLP considered DAWG POUND to be a Club Mark, and licensed its use to various third parties.  (Id. ¶ 17).  Prior to 1994,[3] NFLP accepted licensing fees for at least the following merchandise that used the phrase "Dawg Pound" in some form:

- T-Shirts:  in 1989, Trench Manufacturing Co. sold 176 units of officially licensed t-shirts bearing the words

---

[3]    As further explained below, HP alleges that it first used the mark in commerce in early 1994.

"DAWG POUND" for a total of $15,108.60.  (HP Exs. M & N).

- **Christmas Cards**: Cleveland-area Hallmark stores sold Christmas cards, copyrighted 1989 and 1990, that featured the DAWG POUND mark.  (Noch Decl. ¶¶ 3-5). One such card depicted Santa Claus standing in front of a group of anthropomorphized dogs sitting in football stadium bleachers behind a banner that reads "CLEVELAND DAWG POUND."  (Id. Ex. 1).  Another such card depicted Santa Claus sitting in a recliner watching a Browns game with a dog wearing a "BROWNS DAWG POUND" sweatshirt.  (Id.).  Both cards displayed the familiar NFL shield on the back with the words "Officially Licensed Product."  (Id.).

- **Posters**: In 1993, Andrew Noch & Associates ("Noch") received a license from NFLP to manufacture and distribute a poster depicting a photograph of Municipal Stadium with the words "The Dawg Pound" underneath the photograph.  (Noch Decl. ¶ 5 & Ex. 4).  Noch sold these posters to various retailers, including ten copies to a retailer called A.I.M. Enterprises, Inc., on February 16, 1994.  (Id. Ex. 5).

- **Logos**: Logo-7, Inc., an apparel manufacturer later acquired by Tultex Corporation and then Reebok International Ltd., created graphic designs for use on its apparel, which were submitted to NFLP for its approval.  (Barkes Decl. ¶¶ 3, 7).  NFLP received licensing fees for Browns-related logos bearing the word DAWG, including one in 1989 with "DAWG POUND" over a picture of a bulldog and the words "CLEVELAND BROWNS."  (Id. ¶ 13).  Logo-7 sold $123,241.70 worth of merchandise bearing the words DAWG or DAWG POUND in 1989 and 1990.  (Id. ¶ 18 & Ex. 6).

- **Other Apparel**: In 1992 and 1993, Nutmeg Mills, Inc., a sports apparel manufacturer, submitted various designs to NFLP for approval for use on Nutmeg's apparel, including an image of a bulldog wearing a football helmet and jersey sitting in front of a doghouse with the words "DAWG POUND."  (Ivie Decl. ¶¶ 1, 8-9, & Ex. 2).  The entire image is contained between the words "Cleveland Browns."  (Id. Ex. 2).  At least sixty units of clothing bearing the DAWG POUND mark were shipped to JCPenny, among other retailers.  (Id. ¶ 10).

While all this was happening, HP was founded in 1986 by Donald Shepherd (its president and sole shareholder) and began to

manufacture and distribute apparel bearing phrases such as "DAWG
POUND," "LIL DAWG POUND," and "TOP DAWG" in the early and mid-
nineties, after Shepherd's teenage son was given the nickname
"Top Dawg" by members of his baseball team in 1991.  (Shepherd
Decl. ¶ 1; Shepherd Dep. at 17:7-21, 45).  In March of 1994, HP
attempted to register the DAWG POUND mark with the PTO (alleging
a date of first use in commerce of March 1994), but NFLP opposed
the registration and the mark was never registered.  (See HP Opp.
Br. at 1; Shepherd Decl. ¶ 3).[4]  Shepherd, who had no interest
in football, was not aware until NFLP opposed the DAWG POUND
registration that the words DAWG and DAWG POUND were commonly
used to refer to the fans of the Cleveland Browns.  (Shepherd
Decl. ¶ 3; Shepherd Dep. at 42, 84).

**B.    1995**

        In 1995, the Browns franchise moved to Baltimore and
became the franchise now known as the Baltimore Ravens.  (Proper
Decl. ¶ 12).  There was thus no longer a "Dawg Pound" in
Cleveland, in the sense that the Browns were no longer in
existence.

**C.    1996-1999**

        During this period when there was no "Dawg Pound," HP
sold its apparel in national chains, and since 1991 its total

---

        [4]    The parties represent that HP's application is in
suspension, pending the outcome of this litigation.  (HP Rule
56.1 Statement ¶ 14).  In 1995 and 1996, respectively, HP
registered the marks TOP DAWG and LIL DAWG POUND with the PTO in
applications that were unopposed.  (Shepherd Decl. ¶¶ 7-8).

revenue from DAWG-related merchandise (including DAWG POUND merchandise) is approximately $10 million.  (Shepherd Decl. ¶ 6; HP Rule 56.1 Statement ¶ 13).

###    D.    **1999-Present**

In 1999, the Browns and the "Dawg Pound" returned to Cleveland.[5]  On March 26, 1999 (prior to the start of the 1999-2000 NFL season), the Browns and NFLP -- which had never registered or attempted to register DAWG POUND prior to this -- filed an intent-to-use application with the PTO for the DAWG POUND mark.  (Proper Decl. ¶¶ 12, 13).  In August of 1999, the application was rejected on account of its similarity to, and corresponding likelihood of confusion with, HP's LIL DAWG POUND mark, which had been successfully registered in 1996.  (Proper Decl. ¶¶ 12, 13; HP Ex. L).  On March 29, 2000, HP's counsel sent a letter to the Browns and NFLP, demanding that they immediately cease and desist using the DAWG POUND mark.  (HP Rule 56.1 Statement ¶ 25; Def. Rule 56.1 Statement ¶ 25).  Five months later, in August of 2000, NFLP commenced a lawsuit against HP in Ohio district court, seeking a declaration of non-infringement. (HP Rule 56.1 Statement ¶ 26; Def. Response ¶ 26).  The district court dismissed the case for lack of personal jurisdiction over HP, and the Sixth Circuit affirmed on February 2, 2004.  See Cleveland Browns Football Co., LLC v. Hawaii-Pacific Apparel

---

[5]    The Cleveland Browns website advertises "Dawg Pound" seating and refers to "Dawg Pound" as "[o]ne of the most famous trademarks in sports."  http://www.clevelandbrowns.com/stadium /seating/dp_seating.php (last visited February 9, 2006).

-7-

Group, Inc., 90 Fed. Appx. 868, 2004 WL 232731 (6th Cir. 2004).

## II.    **Procedural History**

HP commenced this action by filing a complaint on October 4, 2004.  The complaint contains four counts: trademark infringement under the Lanham Act, unfair competition under the Lanham Act, unfair competition under state law, and a declaration of non-infringement.  Defendants answered on December 3, 2004, and asserted seven counterclaims that, in substance, mirror HP's claims.  On January 24, 2005, HP replied to the counterclaims, and on February 11, 2005, HP filed an amended reply to the counterclaims that asserted additional counterclaims for copyright infringement.  Defendants answered these counterclaims on April 19, 2005.  After discovery as to liability only,[6] the parties filed the current cross-motions for partial summary judgment on the issue of priority of use.

## DISCUSSION

The issues to be decided on these cross-motions are whether any issue of fact exists to be tried as to which party is the senior user and, if not, whether HP or the Browns and NFLP used the mark first.

## I.    **Priority of Use -- Applicable Law**

It is a fundamental principal of trademark law that the right to exclusive use of a trademark

---

[6]    On February 8, 2005, the Court bifurcated the case into liability and damages phases and ordered discovery to proceed as to liability only.

> derives from its appropriation and subsequent
> use in the marketplace.  The user who first
> appropriates the mark obtains an enforceable
> right to exclude others from using it, as
> long as the initial appropriation and use are
> accompanied by an intention to continue
> exploiting the mark commercially.

H.W. Carter & Sons, Inc. v. William Carter Co., 913 F. Supp. 796,
802 (S.D.N.Y. 1996) (quoting La Societe Anonyme des Parfums Le
Galion v. Jean Patou, Inc., 495 F.2d 1265, 1271 (2d Cir. 1974));
see also Talk To Me Prods., Inc. v. Larami Corp., 804 F. Supp.
555, 559 (S.D.N.Y. 1992) ("The exclusive right to a distinctive
mark belongs to the one who first uses it in connection with a
particular line of business."), aff'd, 992 F.2d 469 (2d Cir.
1993).  It is therefore only the senior user of a mark that can
bring a claim for trademark infringement or state or federal
unfair competition.  See Genesee Brewing Co. v. Stroh Brewing
Co., 124 F.3d 137, 150 (2d Cir. 1997) ("[T]o recover for unfair
competition [a plaintiff] must show . . . an association of
origin by the consumer between the mark and the first user.")
(citation omitted) (emphasis added); id. at 149 ("Under New York
law, common law unfair competition claims closely resemble Lanham
Act claims except insofar as the state law claim may require an
additional element of bad faith or intent.") (quoting Girl Scouts
v. Bantam Doubleday Dell Publ'q Group, Inc., 808 F. Supp. 1112,
1131 (S.D.N.Y. 1992).

        Not every use of a mark will suffice to create
enforceable rights.  Rather, "[t]he 'talismanic test' for
sufficient prior use in commerce is whether a person's use of the

mark was sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 15 F. Supp. 2d 389, 396 (S.D.N.Y. 1998). Use of the mark by a licensee to identify or distinguish goods is sufficient to create enforceable rights in favor of the licensor. See 2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 18.46 (4th ed. 2004) ("Ownership rights in a trademark . . . can be acquired and maintained through the use of the mark by a controlled licensee even when the first and only use of the mark was made . . . by the licensee."); see also Turner v. HHM Pub. Co., 380 F.2d 224, 229 (5th Cir. 1967) ("In our view . . . the Lanham Act definitely contemplates that a trade or service mark may be acquired through its use by controlled licensees, even though the registrant itself may not have used the mark."); Pneutek, Inc. v. Scherr, 211 U.S.P.Q. 824, 833, 1981 WL 40499 (T.T.A.B. 1981) (same).[7] A licensor, however,

---

[7] That use by a licensee can establish trademark rights for the licensor is contemplated by the Lanham Act, which provides, in pertinent part:

> Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or its registration, provided such mark is not used in such manner as to deceive the public. If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of

is required to exercise some degree of control over the use of the mark by the licensee, at the risk of abandonment of the mark. See Twentieth Century Film Corp. v. Marvel Enters., Inc., 277 F.3d 253, 259 (2d Cir. 2002) ("Marvel, as the licensor of the 'X-Men' property, is obliged to maintain some control over the quality of the licensed property as an incident of valid licensing or risk abandonment of its mark.") (citations omitted).

## II.    **Application**

NFLP and the Browns contend that they are entitled to summary judgment on HP's claims of infringement because they licensed the DAWG POUND mark to others years before HP alleges to have first used the mark in 1994,[8] and that therefore no reasonable jury could find that HP was the senior user. (Def.

---

the registrant or applicant, as the case may be.

15 U.S.C. § 1055. Thus, the Lanham Act contemplates allowing applicants to register marks based on controlled use by another.

[8]    HP claims that it first "adopted" the mark in 1991 (HP Opp. Br. at 1), but also states in its brief that when it attempted to register the DAWG POUND mark in March 1994, it alleged a date of first use of March 1, 1994. (HP Opp. Br. at 1). In its Rule 56.1 statement of undisputed facts, HP alleges a date of first use of March 8, 1994. (HP Amended Rule 56.1 Statement ¶ 12). In a declaration, Shepherd states that the "Date [of] First Shipment" was August 6, 1994. (Shepherd Decl. ¶ 5). The Court accepts for purposes of this motion that HP's date of first use was some time in March 1994, because, as explained above, it is the date of first use in commerce that controls. The Court notes that HP appears to make no claim of priority of use before 1994. (See HP Opp. Br. at 10 (referring to "HP's claim of priority from and after 1994"). In any event, even if HP did claim a date of first use of 1991, the result would be no different because, as explained above, the Browns and NFLP licensed the mark for use on t-shirts and Christmas cards as early as 1989.

Br. at 6-7).  I agree.

HP concedes that "it could be argued that use by a licensee qualifies as 'use' for trademark ownership purposes in some situations," but argues that NFLP and the Browns did not, as required, control their licensees.  (HP Br. at 21-22).  A reasonable jury could only conclude otherwise.  The indisputable facts show that, prior to using the DAWG POUND mark on approved merchandise, licensees had to sign lengthy licensing agreements that required, among other things, the licensees to submit samples of their products to NFLP for approval prior to placing them in the stream of commerce.[9]  Moreover, the record further

---

[9]    One such licensing agreement provided, in part, as follows:

**Quality Control/Product Approval Forms**

All Licensed Products and their packaging must receive quality control approval by NFLP.  All Licensed Products will meet uniform standards of high quality, style, construction, and appearance set by NFLP.  Licensee agrees that it will sell no Licensed Products unless an NFLP Licensed Product Quality Control Approval Form ("Product Approval Form") for that Product has been signed by NFLP, returned to Licensee, and remains in full force and effect.  The following conditions and procedures will govern NFLP's issuance of Product Approval Forms:

(a) Licensee will supply within 10 days of any request by NFLP, at no charge to NFLP, such reasonable number of samples of Licensed Products and their packaging as NFLP may require.

(b) At NFLP's request, Licensee will present its complete line of Licensed Products to NFLP at a mutually agreeable time, date, and site.

(c) NFLP will make best efforts to evaluate Licensed Product submissions within 45 days of their receipt by NFLP.

(d) Licensee will not deviate from the standards of quality of samples upon which Product Approval Forms are based.

reflects that various licensees did indeed adhere to the approval process.  For example, Jon Barkes, a production artist at Logo-7, stated in his declaration that "Logo-7 often would create graphic designs for each of the Member Clubs . . . [and] then submit these designs to NFLP for approval."  (Barkes Decl. ¶ 7).[10] Similarly, Andrew Noch, who owned a company that manufactured and sold DAWG POUND posters (among other NFL paraphernalia), submitted with his declaration a letter he received from NFLP in October 1993, indicating that his design for a DAWG POUND poster had been approved.  (Noch Decl. Ex. 2).  Finally, Angela Ivie, a licensing manager of a sport apparel manufacturer called VF Imagewear, Inc. ("VF Imagewear"), stated in her declaration that VF Imagewear would submit artwork to NFLP for its approval prior to using it on apparel.  (Ivie Decl. ¶ 7).  Ivie also attached a May 26, 1992, letter from NFLP, signed by a "Quality Control Coordinator," which approved a design that Ivie had submitted that incorporated the phrase "Dawg Pound."  (Id. Ex. 2).

In sum, because the Browns and NFLP licensed goods that

---

Departure from such quality standards constitutes breach of a material term of this License.  NFLP may purchase at Licensee's expense any Licensed Products found in the marketplace which in NFLP's judgement [sic] are inconsistent with approved quality standards and bill such costs to Licensee.  Licensee must also pay all Royalties otherwise consistent with approved quality standards.

(e) Product Approval Forms must be renewed annually by NFLP pursuant to the terms and conditions set forth above.

(McDowell Decl. Ex. 11).

[10]     The Barkes declaration references a logo containing the phrase "Dawg Pound" that was first used on April 21, 1989.

contained the words "Dawg Pound" together with some general
reference to the Browns or the NFL years before HP ever used the
DAWG POUND mark in commerce, no reasonable jury could find that
HP was the senior user.[11]  Because I hold that the Browns/NFLP's
licensing of the mark was sufficient as a matter of law to
establish priority of use, it is unnecessary to reach the issue
-- addressed in the briefs -- that use of "Dawg Pound" by the
public before HP ever used the mark could inure to the benefit of
the Browns and NFLP.[12]

---

[11]     HP contends that the mere fact that the phrase "Dawg
Pound" appeared in some form on officially-licensed NFL
merchandise related to the Browns does not establish that it was
used as a mark.  (HP Br. at 14-15).  But the Lanham Act
specifically provides that "a mark shall be deemed to be in use
in commerce . . . when it is placed in any manner on the goods
. . . and the goods are sold or transported in commerce."  15
U.S.C. § 1127 (emphasis added).  Moreover, the phrase was used on
the products in question -- t-shirts, posters, Christmas cards,
etc. -- to identify the goods as products associated with the
Cleveland Browns and the NFL.

[12]     I note that courts and commentators have recognized the
principle that use only by the public -- even absent actual use
by the claimant -- can be considered use by the claimant and
inure to its benefit.  See, e.g., Nat'l Cable Television Ass'n,
Inc. v. Am. Cinema Editors, Inc. 937 F.2d 1572, 1577-78 (Fed.
Cir. 1991) ("[E]ven without use directly by the claimant . . . ,
the courts . . . generally have recognized that abbreviations and
nicknames of trademarks or names used only by the public give
rise to protectable rights in the owners of the trade name or
mark which the public modified.  Such public use by others inures
to the claimant's benefit and, where this occurs, public use can
reasonably be deemed use 'by' that party in the sense of use on
its behalf.").  The parties do not seriously dispute that a
significant portion of the relevant public sector associated
"Dawg Pound" with the Browns and the NFL, and indeed there are
literally hundreds of examples in the record of uses of the
phrase "Dawg Pound" by the public to refer to the Browns or their
fans.  Thus, to the extent NFLP and the Browns owned trademark
rights in the Browns name itself (a fact which is not in
dispute), use by the public of "Dawg Pound" arguably inures to
the benefit of the Browns and NFLP, and could constitute an

Finally, there is some suggestion in the briefs that the Browns and NFLP abandoned whatever rights they had in the DAWG POUND mark because (1) their use of the mark was only sporadic at best between 1995 and 1999 (the period in which there was no Browns team in Cleveland), and (2) they failed to oppose HP's registration of its LIL DAWG POUND mark in 1996. A finding of abandonment requires evidence that use of the mark "has been discontinued with intent not to resume such use," 15 U.S.C. § 1127, and it would defeat an alleged owner's claim of priority. See Emmpresa Cubana Del Tabaco v. Culbro Corp., 213 F. Supp. 2d 247, 267-68 (S.D.N.Y. 2002) ("Once abandoned, the mark reverts back to the public domain whereupon it may be appropriated by anyone who adopts the mark for his or her own use. Hence a party that is found to have abandoned its mark is deprived of any claim to priority in the mark before the date of abandonment.") (citation omitted). Because abandonment constitutes forfeiture of a property right, it must be proven by clear and convincing evidence. Id. (citation omitted).

Here, no reasonable jury could find, by clear and convincing evidence, that the Browns and/or NFLP abandoned the mark. Indeed, the record reflects that the Browns and NFLP enforced what they perceived to be their rights in the DAWG POUND mark during the period between 1995 and 1999. (See HP Exs. D-1 & D-2 (letters from assistant counsel for NFLP to alleged trademark

---

independent basis for holding that the Browns and NFLP are the senior users.

infringer)).  Accordingly, this is not a basis upon which to deny summary judgment to the Browns and NFLP.

## CONCLUSION

For the foregoing reasons, HP's motion for partial summary judgment on the issue of priority of use is denied, and that of the Browns/NFLP is granted.  Accordingly, counts one, two, and three of HP's complaint are dismissed.  Furthermore, summary judgment is granted in favor of the Browns and NFLP on count one of their counterclaims (declaration of non-infringement).  Still remaining are the Browns/NFLP's counterclaims for trademark infringement, as well as HP's claim for a declaration of non-infringement and its claims of copyright infringement.

The parties are directed to appear for a pre-trial conference on February 24, 2006, at 11:30 a.m., in courtroom 11A of the United States Courthouse, 500 Pearl Street, New York, New York.

SO ORDERED.

Dated:     New York, New York
           February 14, 2006

Amended:   February 22, 2006

DENNY CHIN
United States District Judge

-16-